UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Andrea Pollack and
Angela Garozzo Scopelianos,
          Plaintiffs
     v.                                Case No. 20-cv-825-SM
                                       Opinion No. 2021 DNH 135
Goodwin & Associates
Hospitality Services, LLC
d/b/a Goodwin Recruiting,
Eric Goodwin, and Scott Gaba,
          Defendants


                         **O R D E R**


     Plaintiffs, Andrea Pollack and Angela Garozzo Scopelianos,

filed suit against defendant Goodwin & Associates, LLC, d/b/a

Goodwin Recruiting, and its officers, Eric Goodwin and Scott

Gaba.  They allege that, by improperly misclassifying plaintiffs

as "independent contractors," defendants failed to pay them

earned wages, including overtime pay and benefits, in violation

of applicable federal and state laws.  Plaintiffs also assert

claims for negligent and fraudulent misrepresentation,

defamation, unjust enrichment, and violation of New Hampshire's

Consumer Protection Act.

     Defendants have moved to dismiss plaintiffs' claims for

misclassification under the Fair Labor Standards Act ("FLSA")

and analogous state statutes, as well as plaintiffs' claims for

violation of the New Hampshire Consumer Protection Act, for

fraudulent and negligent misrepresentation, defamation, unjust enrichment, and declaratory judgment.  That motion is granted in part and denied in part.

## STANDARD OF REVIEW

When ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must "accept as true all well-pleaded facts set out in the complaint and indulge all reasonable inferences in favor of the pleader."  SEC v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010).  Although the complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), it must allege each of the essential elements of a viable cause of action and "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and internal punctuation omitted).  In other words, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Instead, the facts alleged in the complaint must, if credited as true, be sufficient to "nudge[ ] [plaintiff's] claims across the line from conceivable to plausible."  Id. at 570.

Generally, a court must decide a motion to dismiss exclusively upon the allegations set forth in the complaint and the documents specifically attached or convert the motion into one for summary judgment.  See Fed. R. Civ. P. 12(2).  There is, however, an exception to that general rule, as "[a] district court may also consider 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'"  Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) (quoting In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 20 (1st Cir. 2003)) (alterations in original).

## BACKGROUND

Accepting the allegations in plaintiffs' complaint as true – as the court must at this juncture – the relevant facts are as follows.

Defendant Goodwin Recruiting ("Goodwin") is a national employee recruiting firm based in New Hampshire.  Defendants Eric Goodwin and Scott Gaba serve as officers of the company, Goodwin as President, and Gaba as Chief Operating Officer.  The company recruits qualified management candidates for job openings on behalf of its clients, who typically, are employers in the hospitality industry.  Goodwin clients are charged a fee for Goodwin's services.

The company directly employs several people, providing those employees with a comprehensive benefit plan that includes group health care, paid vacation, and retirement savings.[1] Goodwin Recruiting has directly employed at least one recruiter. However, most of the company's more than 130 recruiters are classified as "independent contractors."[2]  Those recruiters live throughout the United States, and typically work out of their homes.

Plaintiffs note that, by classifying its recruiters as independent contractors, rather than as employees, the company benefits in multiple ways.  Goodwin Recruiting does not provide benefits to its recruiters, nor does the company pay social security or Medicare taxes, or unemployment or workers' compensation insurance premiums on their behalf.  Goodwin also does not pay its recruiters a regular, consistent salary.  So, during the three to six-month "ramp up" period for new recruiters, Goodwin bears minimal risk.  Moreover, Goodwin avoids any administrative burdens associated with completing

---

[1]    According to plaintiff, Goodwin's "LinkedIn" profile lists the company as having 51-200 employees, which number, plaintiff alleges, must necessarily include the company's recruiters.

[2]    Plaintiff estimates that, over the last several years, Goodwin has employed more than 250 recruiters who worked in at least 39 states and Washington, D.C.

required employment filings (e.g., tax documents, payroll
filings, etc.) in each of the states where its recruiters work.


    1.   Plaintiffs and Goodwin Recruiting

Plaintiff Pollack lives in Florida.  She joined Goodwin
Recruiting on May 12, 2015.  Plaintiff Scopelianos lives in
Arizona.  She joined the company on November 6, 2017.  Before
joining, both Pollack and Scopelianos were subject to a
comprehensive application process that included completing a
questionnaire, submitting to background checks, providing
multiple references, and participating in multiple interviews.

Upon joining Goodwin Recruiting, Pollack and Scopelianos
signed several agreements, including an Independent Contractor
Agreement, a Nondisclosure Agreement, a Code of Ethics
Agreement, and a "Core Values and Focus" Agreement.  Pollack and
Scopelianos also signed a Covenant Not to Compete Agreement,
although they signed different versions.  The Noncompete
Agreement Pollack originally signed prohibited her from
performing services in any capacity in the hospitality
recruiting business, or in a business that provides services
similar to Goodwin Recruiting, for a period of three years after
termination of the Independent Contractor Agreement, within 75
miles of Goodwin's office or within the market where the
contractor served Goodwin.  That agreement was subsequently

amended, and, as signed by Scopelianos, prohibited former recruiters from soliciting independent contractors or employees of Goodwin Recruiting, or soliciting any client that the recruiter serviced and that engaged Goodwin Recruiting, for a period of two years after termination of the recruiter's Independent Contractor Agreement.[3]  On February 22, 2018, Pollack signed renewed agreements with Goodwin Recruiting, including the amended noncompete agreement.

Scopelianos worked for Goodwin Recruiting from Arizona. Pollack initially worked in Colorado, through June 2018, at which point she began working and recruiting in Florida.  Both plaintiffs were considered successful recruiters by the company: Pollack won Goodwin Recruiting's "Recruiter of the Year" award in 2018, and Scopelianos won it in 2019.  Scopelianos and Pollack left Goodwin Recruiting on April 27, 2020.

---

[3]   Plaintiff alleges that the revised noncompete is not a "covenant not to compete" in the "traditional meaning of that type of restrictive covenant, because it does not prevent one from competing with Goodwin Recruiting or from joining a competitor," or "prevent a former Goodwin Recruiting recruiter from recruiting for themselves or on behalf of another person or entity in any market, industry type, or geographic area."  Am. Compl. ¶ 28.

2.   <u>Goodwin Recruiting's Control Over Recruiters</u>

Plaintiffs allege that Goodwin Recruiting exercised substantial control over when, where, and how its recruiters perform their work.  Plaintiffs' allegations describe Goodwin Recruiting's requirements regarding recruiter training, supervision, performance of work-related duties, and recruiter integration with the company.[4]

<u>Training</u>.  Goodwin requires recruiters to undergo mandatory company training upon joining the company.  When Pollack joined in 2015, that training lasted approximately four weeks, while Scopelianos's training lasted at least two weeks.  Following the initial training period, recruiters were required to continue to train with their Regional Directors of Recruiting ("RDRs")[5] over the next six months.  According to plaintiffs, new recruiters are informed that Goodwin Recruiting would be "fully integrated" into their day-to-day efforts for at least the first year, but the company's "micromanagement lasted well beyond a year,"

---

[4]    Plaintiffs' Amended Complaint sets forth in substantial detail factual allegations relating to Goodwin Recruiting's control over its recruiters.  For brevity's sake, the court will not recount the entirety of the allegations but will instead briefly summarize some of plaintiffs' pertinent assertions.

[5]    The company assigns each recruiter an RDR, who is responsible for managing and supervising a team of recruiters. RDRs are Goodwin Recruiting employees, and do not place candidates.

continuing "throughout their entire tenure at Goodwin
Recruiting."  Am. Compl. ¶ 40.


    <u>Performance of Work-Related Tasks</u>.  As recruiters, Pollack
and Scopelianos performed a variety of tasks, including
searching for candidates to fill open positions; prescreening
candidates; interviewing potential candidates and evaluating
qualifications and experience; and following up through the
interview and placement process.  Goodwin specified "how" and
"when" these tasks were performed.  The company's comprehensive
expectations and requirements for its recruiters were set out in
Goodwin's manuals, policies, communications, and directives from
the company's RDRs and other executives, as well as other
company-issued documents.

    Plaintiffs allege that Goodwin provided recruiters with
written instructions that directed the sequence of the
performance of their work tasks: The company's training manual
includes "detailed, step-by-step instructions on how to perform
the work and the proper sequence of events and tasks."  <u>Id</u>. at
¶ 59.  Goodwin required that many tasks be performed within
specific timeframes, and "if the recruiter failed to follow the
protocols" within the requisite timeframe, that recruiter would
"lose 'ownership' of the candidate or client."  Am. Compl. ¶ 61.

The company also imposed communication requirements, including how many hours could pass before a recruiter returned an interoffice phone call, and how many hours could pass before a recruiter sought client feedback about an interview with a prospective employee.  Goodwin Recruiting restricted recruiters' use of text messaging to communicate with clients and candidates and dictated how text messaging was to be used; instructed recruiters to limit personal phone calls to one per day (lasting no longer than five minutes); delineated restrictions and guidelines for recruiters' use of social media; and instructed recruiters to limit their personal internet surfing.  Id. at ¶¶ 67-68.  The company further provided "explicit rules to recruiters about which words to use when communicating verbally."  Id. at ¶ 79.

Goodwin mandated that recruiters use "Goodwin Recruiting" business cards (sporting the company's logo), use company email addresses and an approved email-signature (that was consistent with all other Goodwin recruiters), and display the company's own LinkedIn banner on their LinkedIn profile.  The company also imposed certain clothing standards on its recruiters, detailing that shirts should be ironed, "the type of suit to wear, [and] the condition of one's shoes."  Id. at ¶ 76.

The company required that recruiters work and be accessible in their home offices from at least Monday through Friday from

9 am to 5 pm, and that employees be "on time" (which meant that
recruiters were required to begin work no later than 8:30 a.m.).
However, the company also instructed its recruiters that they
"should work whenever . . . necessary to meet the demands of the
job," which included communicating with clients, candidates, and
colleagues at all hours, including nights and weekends.  Goodwin
told recruiters that "successful recruiters tend to work 50-55
hours a week."  Am. Compl. ¶ 43.  Both plaintiffs routinely
worked more than 55 hours a week.

While recruiters were out of the office or otherwise
inaccessible, Goodwin required that they send a company-wide
email disclosing their absence, use an "out-of-office" email
directing the sender to an alternate contact, and delegate an
individual to manage their workload during their absence.  Am.
Compl. ¶ 49.

The company required that all recruiters use its software
system and determined what metrics recruiters had to track on
that system.  In effect, that requirement resulted in recruiters
constantly entering metrics relating to all aspects of their
day-to-day activities.  Am. Compl. ¶ 51.  Those metrics were
used by RDRs to track recruiter performance.

Recruiters were required to attend mandatory monthly "all
team" meetings, and monthly team group meetings with their RDRs.
In addition, RDRs held regular weekly meetings that were

10

characterized as "optional," but attendance was taken.  Because
RDRs had access to recruiters' calendars, RDRs would schedule
those "optional" weekly meetings using recruiters' calendars to
determine when recruiters were available.  Recruiters were also
required to attend mandatory all-company calls.  Before those
calls, RDRs would send their recruiters "rules to follow,"
instructing recruiters not to read, send or reply to text
messages during the call; to log in, on camera, and be muted by
the scheduled start time; to be professionally attired, and
positioned in front of a professional background; and to "pay
attention."  Am. Compl. ¶ 63.

       Supervision and Oversight.  Both Pollack and Scopelianos
were overseen by RDR Joy Schneiderman.  When Schneiderman was
out of the office, Pollack and Scopelianos were assigned a new
RDR to manage them.  RDRs communicated regularly with
recruiters, emailing them frequently concerning their
activities.  Recruiters were required to engage in "business
plan reviews" with their RDRs, and RDRs regularly scheduled
"client analysis sessions" with recruiters.  Am. Compl. ¶¶ 53-
54.  RDRs tracked and monitored recruiter workflow and
implemented action plans when recruiters "underperformed."  Id.
at ¶ 55.  Underperforming recruiters were subject to "increased
oversight by their RDR, including increased reporting

obligations," so that RDRs could monitor those recruiters even more closely.  Am. Compl. ¶ 56.

RDRs oversaw candidate placement into open positions, and frequently checked in with recruiters to "inquire about why candidates were not moving through to placement" more expeditiously.  Id. at ¶ 57.  RDRs also directed actions recruiters should take with respect to candidates, including directing whether a recruiter should reject a certain candidate, or when a recruiter should reach out to the client.  Id. at ¶ 57.  Finally, RDRs monitored recruiters' performance by contacting clients to ensure they were satisfied by the services the recruiters provided, and sending each candidate interviewed by recruiters a survey to assess the recruiter's performance.

Integration.  Plaintiffs allege that Goodwin paid for and provided recruiters with a variety of employment-related tools, including phones, online messaging services, email, and other centralized software and IT systems.  Goodwin also occasionally provided recruiters with assistants, who were direct employees of the company.

RDRs frequently communicated with recruiters regarding requirements relating to Goodwin's forecasted sales reports, and goals.  The company provided recruiters with holiday cards to distribute to clients that contained holiday greetings from

Goodwin Recruiting.  Finally, recruiters were not permitted to perform recruiting services for any other company – their services were exclusively available to Goodwin.

###    3.   The Noncompete Agreement

As discussed, Goodwin required recruiters to sign a Noncompete Agreement with the company.  After amendment, that "non-compete agreement" prohibited recruiters from soliciting "other independent contracts and employees of Goodwin Hospitality" and from "soliciting or contracting with any client that Contractor serviced and that engaged Goodwin Hospitality for any purpose" during the recruiter's association with the company.  Defs.' Exhibit 2, p. 10-11.  Thus, after it was revised, the agreement, by its terms, no longer prohibited recruiters from working in competition with the company after their association ended.  Plaintiffs say that defendant Goodwin "and other executives at Goodwin Consulting utilized [the] commonly understood definition of 'noncompete' to their advantage and to the detriment of their workers," in that, despite the revisions, Goodwin continued to falsely represent that the agreement precluded competition by its employees for a fixed period after the employment relationship ended.  Am. Compl. ¶ 136.

Plaintiffs allege that defendants would "routinely boast" about their success in enforcing the noncompete agreement, and that the company had "never lost' a 'noncompete' case."  Id. at ¶ 137.  Those statements, plaintiffs say, were intended as threats, and "to intimidate recruiters," even though Goodwin, Gaba, and the company's other executives were aware that the agreement "did not prevent [recruiters] from working for a competitor or in competition with Goodwin Recruiting."  Id. at ¶¶ 138, 139.

Plaintiffs contend that defendants deceived its recruiters by continuing to call the agreement a "Covenant Not to Compete" after it was amended, even though the agreement "no longer prevented working for a competitor or in competition with Goodwin Recruiting."  Id. at ¶ 140.  When recruiters terminated their relationship with the company, defendants would remind recruiters "of their supposed 'noncompete' obligations," "in a continued effort to deceive its recruiters into fearing that they could not take a job at a competing agency or otherwise compete with Goodwin Recruiting."  Id. at ¶143.

After plaintiffs terminated their relationship with the company in April 2020, Pollack and Scopelianos received an email from the company that stated: "We do want to take this time to remind you about the Non-Disclosure Agreement as well as our Covenant Against Solicitation which includes a Non-Compete and a

Non-Solicitation of clients, candidates, employees and
independent contractors . . . .  [W]e expect these agreements to
be honored."  Am. Compl. ¶ 145.  The company also sent
plaintiffs a letter that referenced the noncompete agreements:
"We would be remiss not to personally remind you about our Non-
Compete Agreement, as well as your agreement not to solicit
clients, candidates, employees and independent contracts of
Goodwin Recruiting."  Id. at ¶ 146.

On May 24, 2020, Scopelianos emailed Goodwin Recruiting,
seeking clarification about the email and letter she had
received.  Gaba responded, copying Goodwin: "The non-compete is
simply that you can't work in the same capacity, as [an] agency
recruiter, either on your own or for an agency in the
hospitality industry AND you [cannot] solicit to do work with
any candidates or clients that you had knowing access [to] in
our system in any industry."  Am. Compl. ¶ 150.  Gaba's email,
plaintiffs say, "served to solidify the incorrect message
contained in the [company's] warning email and letter."  Id. at
¶ 151.

On June 8, 2020, after plaintiffs' departure from the
company, Goodwin Recruiting held a mandatory company meeting
call, with over 100 people in attendance.  During the call,
Goodwin told attendees that Pollack and Scopelianos had started
their own business, adding, "we have an agreement, a contract

15

that everyone is well aware of."  Am. Compl. ¶ 152.  Goodwin

then:

> launched into a discussion about integrity and honesty,
> suggesting that Plaintiffs do not have integrity and
> are not honest.  He emphasized that he expects that
> people who sign the agreement will "hold up their end
> of the bargain," implying clearly that the Plaintiffs
> have not.  Goodwin then boasted, as he had done
> numerous times in the past, about his company's success
> in litigation concerning its agreements, again saying
> "we've never lost," and he will use "all resources" to
> protect Goodwin Recruiting.

Am. Compl. ¶ 152.  According to plaintiffs, Goodwin was

suggesting that they had engaged in some sort of illegal

activity, or breached their agreement with the company, neither

of which was true and, Goodwin was aware that neither was true.

Based on the foregoing, plaintiffs assert 16 claims against

the defendants: claims under the FLSA for misclassification,

failure to pay minimum wage, failure to pay overtime; claims for

misclassification and failure to pay minimum wage claims under

Arizona law (Scopelianos); claims for misclassification and

failure to pay minimum wage under Florida law (Pollack); claims

for misclassification, failure to pay minimum wage and overtime

violations under New Hampshire law; a claim for violation of New

Hampshire's Consumer Protection Act; and claims for negligent

misrepresentation, fraudulent misrepresentation, defamation,

unjust enrichment, and for declaratory judgment.

16

**DISCUSSION**

Defendants have moved to dismiss plaintiffs' claims for misclassification under the FLSA and state statutes, for violation of the New Hampshire Consumer Protection Act, for fraudulent and negligent misrepresentation, defamation, unjust enrichment, and declaratory judgment.


1.   Misclassification Claims

Defendants argue that plaintiffs' misrepresentation claims under federal and state law must be dismissed because there is no recognized private right of action for "misclassification" of employees as independent contractors under the relevant statutory schemes.  Defendants contend that private litigants (like the plaintiffs) may only assert FLSA claims for unpaid wages and overtime, and for damages for unlawful termination. Similarly, defendants say, the Arizona, Florida, and New Hampshire statutes provide private rights of action for wage violations, not for claims of "misclassification."

The relevant authority is scarce but supports defendants' point.  See, e.g., Altare v. Vertical Reality MFG, Inc., No. 19-CV-21496, 2020 WL 209272, at *2 (S.D. Fla. Jan. 14, 2020) ("The FLSA's plain text does not provide a cause of action for misclassification and the Court is not empowered to create one."); Cf., Viscito v. Nat'l Plan. Corp., No. CV 18-30132-MGM,

2021 WL 359314, at *5 (D. Mass. Jan. 22, 2021) ("As the moving
party, Defendants have asserted there are no contested material
facts relevant to Plaintiff's FLSA claim because the FLSA does
not create a legal claim for misclassification.  In order to
avoid summary judgment, Plaintiff is obligated to demonstrate,
with record evidence, that he has suffered an injury compensable
under the FLSA.  As he has failed to do that, summary judgment
is appropriate as to the FLSA claim (Count I).").

Plaintiffs do not meaningfully respond.  Instead, they
argue that their misclassification claims should not be
dismissed because they are only seeking declaratory relief, and,
pursuant to rights conferred on them by the Uniform Declaratory
Judgment Act, they are entitled to a declaration that they have
been misclassified as independent contractors.  But plaintiffs
have not asserted those claims under the Declaratory Judgment
Act.[6]  Recognizing that fact, plaintiffs seek to amend their
complaint.  To the extent they can do so in good faith,
plaintiffs are of course free to file a motion to amend, but the
effort will likely prove futile, as declaratory judgment with
respect to that issue is probably both unnecessary and

---

[6]    It is worth noting that any claims asserted under the
Declaratory Judgment Act would be largely redundant, as whether
plaintiffs were misclassified as independent contractors must
necessarily be determined to resolve their federal and state
claims for unpaid wages.

inappropriate.  See Am. Civil Liberties Union of Massachusetts
v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 53 (1st
Cir. 2013) ("With limited exceptions, not present here, issuance
of a declaratory judgment deeming past conduct illegal is also
not permissible as it would be merely advisory.").

　　　　　2.　Misrepresentation Claims

　　　　Defendants also move for dismissal of plaintiffs'
fraudulent and negligent misrepresentation claims because, they
contend, plaintiffs have not sufficiently alleged that
defendants knowingly made misrepresentations upon which
plaintiffs reasonably relied.

　　　　The New Hampshire common law is clear: "One who fraudulently
makes a misrepresentation for the purpose of inducing another to
act or to refrain from action in reliance upon it, is subject to
liability to the other in deceit for pecuniary loss caused to
him by his justifiable reliance upon the misrepresentation."
Tessier v. Rockefeller, 162 N.H. 324, 331-32 (2011) (internal
quotation marks omitted).  "A misrepresentation is made
fraudulently if it is 'made with knowledge of its falsity or
with conscious indifference to its truth and with the intention
of causing another person to rely on the representation.'"
Moulton v. Bane, No. 14-CV-265-JD, 2016 WL 1091093, at *10

(D.N.H. Mar. 21, 2016) (quoting Tessier, 162 N.H. at 332)
(further quotations omitted).

To state a claim for negligent misrepresentation under New
Hampshire law, plaintiffs must allege "a negligent
misrepresentation of a material fact by the defendant and
justifiable reliance by the plaintiff." Snierson v. Scruton,
145 N.H. 73, 78 (2000), as modified (Nov. 22, 2000). As the New
Hampshire Supreme Court has stated, "[i]t is the duty of one who
volunteers information to another not having equal knowledge,
with the intention that he [or she] will act upon it, to
exercise reasonable care to verify the truth of his [or her]
statements before making them." Id.

In support of their fraud claim, plaintiffs allege that
defendants misrepresented the terms of the noncompete agreement.
Before it was amended, Goodwin Recruiting's noncompete agreement
prevented recruiters from performing services in any capacity in
the hospitality recruiting business, or a business that provides
services similar to the company, for three years after
termination, and within 75 miles of Goodwin's office or within
the market where the contractor served Goodwin. But, after
amendment, the noncompete precluded only the solicitation of
independent contractors or employees of Goodwin Recruiting, and
the solicitation of any client that the recruiter had serviced

that had engaged Goodwin Recruiting, for a period of two years following termination of the independent contractor agreement.

Plaintiffs say that, although the noncompete agreement had been amended to be less restrictive, defendants took advantage of the "common understood meaning in American business" of noncompete agreements (that recruiters could not work for a competitor of or in competition with Goodwin Recruiting), in order to threaten and intimidate their recruiters, and to "make them fear being sued."  Am. Compl. ¶ 135-138.  Plaintiffs allege that defendants were aware that the revised noncompete agreement did not prevent recruiters from working for Goodwin's competitors, yet continued calling the agreement a "Covenant Not to Compete."  After plaintiffs left Goodwin, defendants sent misleading emails and letters to plaintiffs concerning their obligations under the noncompete agreement.  And, when Scopelianos sought clarification, defendant Gaba informed her that, pursuant to the agreement, she could not work "in the same capacity, as [an] agency recruiter, either on your own or for an agency in the hospitality industry."  Id. at ¶ 150.

With respect to plaintiffs' fraud claim, specifically, defendants argue that plaintiffs have not met the established heightened pleading requirements, and their fraudulent misrepresentation claim must therefore be dismissed.  Under Federal Rule of Civil Procedure 9(b), the "circumstances of

fraud" must be pled "with heightened specificity," In re Genzyme
Corp. Sec. Litig., 754 F.3d 31, 40 (1st Cir. 2014), including,
"what, specifically, was stated," the "specific nature" of
plaintiff's injury, and plaintiff's "actual reliance on the
alleged false statements.  Woods v. Wells Fargo Bank, N.A., 733
F.3d 349, 358 (1st Cir. 2013).  "[T}he specificity requirement
extends only to the particulars of the allegedly misleading
statement itself."  Rodi v. S. New England Sch. Of L., 389 F.3d
5, 15 (1st Cir. 2004) (citation omitted).  "The other elements
of fraud, such as intent and knowledge, may be averred in
general terms."  Id. (citing Fed. R. Civ. P. 9(b)).

     Defendants contend that, outside of the correspondence sent
to plaintiffs following their departure from the company,
plaintiffs fail to allege the time, place, or recipient of any
of the purported misrepresentations regarding recruiters'
noncompete obligations.  It does appear that the majority of
plaintiffs' allegations in support of their fraud claim are
lacking the requisite specificity.  But, as defendants' own
argument concedes, plaintiffs' allegations regarding
correspondence sent to them following their departure from the
company are sufficient to meet Rule 9(b)'s requirements.  And,
"[w]hen a claim sounding in fraud contains a hybrid of
allegations, some of which satisfy the strictures of Rule 9(b)
and some of which do not, an inquiring court may sustain the

claim on the basis of those specific allegations that are properly pleaded." Rodi, 389 F.3d at 15–16.  Defendants' particularity argument is, therefore, unavailing.

Defendants are on firmer ground, however, in suggesting that plaintiffs' negligent and fraudulent misrepresentation claims must be dismissed because plaintiffs fail to adequately allege justifiable reliance.  The justifiable reliance standard "is not that of ordinary care, but an individual standard, based upon [plaintiff's] own capacity and knowledge."  Smith v. Pope, 103 N.H. 555, 559 (1961).  In other words, it is a subjective standard, rather than an objective "reasonable person" standard.

Plaintiffs' fraud claim is based on defendants' purported misrepresentations regarding the terms and effect of the noncompete agreement.  The clearest example, as alleged by plaintiffs, is defendant Gaba's email to Scopelianos, in which he told her that she could not work "in the same capacity, as [an] agency recruiter, either on your own or for an agency in the hospitality industry."  Am. Compl. at ¶ 150.  Defendants say that such statements communicated a reasonable opinion regarding the contracts' terms and cannot form the basis of a fraud claim. Defendants rely on DePalantino v. DePalantino, 139 N.H. 522, 524 (1995), where the New Hampshire Supreme Court stated: "Opinions regarding the status or interpretation of the law . . . generally will not provide the basis for an action for fraud or

23

misrepresentation." (citing 37 Am. Jur.2d Fraud and Deceit § 73
(1968)).

Plaintiffs do not explain why DePalantino does not apply
here.  Instead, they contend that their reliance was justified
because they are "laypeople and unsophisticated parties" who
were relying on the misrepresentations of company executives.
Am. Compl. ¶ 27.  That argument is unpersuasive.  "The recipient
in a business transaction of a fraudulent misrepresentation is
not justified in relying upon its truth if its falsity is
obvious."  Smith v. Pope, 103 N.H. 555, 559 (1961).  Here, the
noncompete agreement expressly states that plaintiffs agreed to:

> refrain from soliciting other independent contractors
> and employees of Goodwin Hospitality and Contractor
> agrees to refrain from soliciting or contracting with
> any client that Contractor serviced and that engaged
> Goodwin Hospitality for any purpose during the [term
> of the Independent Contractor Agreement].

Document No. 9-4, ¶ 1.  The language used expressly contradicts
any misrepresentations that defendants made to plaintiffs about
its effect, and that language was readily accessible to
plaintiffs.  If plaintiffs were confused as to the agreements'
actual terms, they need only have read the relevant noncompete
agreement.  For that reason, plaintiffs' reliance on defendants'
contrary statements was not justifiable as a matter of law.

In rejecting a similar fraud claim in an action where the
defendant argued that plaintiff had misrepresented the terms of
a contract between them, this court stated, "if an agent of
[plaintiff] said something that was inconsistent, the agreement
itself corrected that inconsistency, and because the agreement
explicitly stated that [plaintiff] retained the copyright in the
plans it produced, [defendants'] reliance upon any oral
statement to the contrary was neither reasonable nor
justifiable." Davis Frame Co. v. Reilly, No. CIV. 05-CV-160-SM,
2006 WL 435454, at *5 (D.N.H. Feb. 22, 2006). Here, too, given
the unambiguous language of the agreement, any reliance on
defendants' statements or suggestion to the contrary was not
justifiable. See, e.g., Davis Frame Co, 2006 WL 435454, at *6
("[t]he agreement said what the agreement said. [Plaintiffs]
had an opportunity to read it before they executed it."). Cf.,
Rockwood v. SKF USA Inc., 758 F. Supp. 2d 44, 59 (D.N.H. 2010)
("reliance on a promise cannot be reasonable when it is
completely at odds with the terms of a written agreement
covering the same transaction.") (quotations omitted).

Because plaintiffs have not sufficiently alleged
justifiable reliance, defendants' motion to dismiss their
fraudulent and negligent misrepresentation claims is granted.

3.   NH Consumer Protection Act

New Hampshire's Consumer Protection Act, N.H. Rev. Stat.
Ann. § 358-A:2, provides that "[i]t shall be unlawful for any
person to use any unfair method of competition or any unfair or
deceptive act or practice in the conduct of any trade or
commerce within this state."  The Act lists several "actions
that fall within its prohibition, but that is not an exhaustive
list of prohibited methods, acts, or practices."  Moulton v.
Bane, No. 14-CV-265-JD, 2016 WL 1091093, at *11 (D.N.H. Mar. 21,
2016) (citing ACAS Acquisitions (Precitech) Inc. v. Hobert, 155
N.H. 381, 402 (2007)).  "If the challenged conduct is not listed
in RSA 358-A:2, to be actionable it 'must attain a level of
rascality that would raise an eyebrow of someone inured to the
rough and tumble of the world of commerce.'"  Moulton, 2016 WL
1091093, at *11 (quoting Axenics, Inc. v. Turner Constr. Co.,
164 N.H. 659, 675 (2013)).

Plaintiffs allege that defendants violated the CPA by
"engaging in a pattern and practice of intimidation and threats,
including repeatedly misrepresenting the restrictions contained
within its [noncompete agreement], and by making false and
professionally disparaging statements" about plaintiffs.  Am.
Compl. ¶ 254.  Defendants urge dismissal of plaintiffs' claim
under the New Hampshire Consumer Protection Act, and, in
support, make two arguments.  First, defendants say that

statements made by the defendants concerning the parties'
contractual relationship and obligations, and general
contractual business dealings (and taking action to ensure that
parties comply with their contractual obligations) are not
violations of the Consumer Protection Act.  Second, defendants
argue that, because courts have held that New Hampshire's CPA
does not apply to conflicts arising from employment
relationships, the same reasoning should be applied to exclude
the parties' independent contractor relationship.  Plaintiffs
fail to meaningfully respond to defendants' arguments, beyond
noting that their CPA claim is pled only in the alternative.

As plaintiffs contend, the Federal Rules of Civil Procedure
permit claims pled in the alternative.  <u>See</u> Fed. R. Civ. Pro.
8(d).  However, plaintiffs' CPA claim fails because plaintiffs
have not plausibly alleged that defendants' conduct constitutes
an "unfair or deceptive act or practice."  RSA 358-A:2.  While
defendants' alleged conduct may have been objectionable,
"selfish bargaining and business dealings will not be enough to
justify a claim for damages" under the Consumer Protection Act.
<u>Hair Excitement, Inc. v. L'Oreal U.S.A., Inc.</u>, 158 N.H. 363, 370
(2009) (<u>quoting Barrows v. Boles</u>, 141 N.H. 382, 390 (1996)).
<u>See also Romano v. Site Acquisitions, Inc.</u>, No. 15-CV-384-AJ,
2016 WL 50471, at *3 (D.N.H. Jan. 4, 2016) ("Although the
plaintiffs' allegations are serious, 'misrepresentations ...

[and] broken promises alone do not rise to the level of rascality where successful [CPA] claims dwell.'") (quoting Franchi v. New Hampton Sch., 656 F. Supp. 2d 252, 255-66 (D.N.H. 2009)).

Because plaintiffs have not sufficiently alleged that defendants' purported conduct "attain[s] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce," George v. Al Hoyt & Sons, Inc., 162 N.H. 123, 129 (2011), they have not stated a claim under New Hampshire's Consumer Protection Act.  Defendants' motion to dismiss plaintiffs' CPA claim is granted.


    4.  Defamation

Next, defendants argue that plaintiffs' defamation claim should be dismissed for failure to state a claim because plaintiffs have not sufficiently alleged the falsity of the statements upon which the claim rests.  And, defendants argue, even if plaintiffs had sufficiently alleged falsity, the statements are not actionable because they are opinions based on disclosed facts.

To state a claim for defamation, plaintiffs must allege "facts that would show that the defendants failed to exercise reasonable care in publishing a false and defamatory statement of fact about the plaintiff to a third party."  Automated

28

Transactions, LLC v. Am. Bankers Assoc., 172 N.H. 528, 532
(2019) (brackets omitted) (quoting Cluff-Landry v. Roman
Catholic Bishop of Manchester, 169 N.H. 670, 678 (2017)).
"Embedded in this recitation is the requirement that the
challenged statement be one 'of fact.'"  Automated Transactions,
172 N.H. at 532 (quotation omitted).  "Conversely, a statement
of opinion is not actionable unless it may reasonably be
understood to imply the existence of defamatory fact as the
basis for the opinion."  Id. (quotation and brackets omitted).

    "An important criterion for distinguishing statements of
opinion from statements of fact is verifiability, i.e., whether
the statement is capable of being proven true or false."
Automated Transactions, 172 N.H. at 533 (quotations omitted).
"Where an expressive phrase, though pejorative and unflattering,
cannot be objectively verified, it belongs squarely in the
category of protected opinion."  Id.  Finally, as the New
Hampshire Supreme Court has explained, "even a provably false
statement is not actionable ... when an author outlines the
facts available to him, thus making it clear that the challenged
statements represent his own interpretation of those facts."
Automated Transactions, 172 N.H. at 534 (quotations omitted).

    Turning, then, to plaintiffs' allegations in support of
their defamation claim, plaintiffs contend that, during a group
conference call on June 8, 2020, Goodwin told meeting attendees

that plaintiffs had left the company to start their own
business, and stated: "we have an agreement, a contract that
everyone is well aware of."  Am. Compl. ¶ 269.  Goodwin then
discussed integrity and honesty, "suggesting that Plaintiffs do
not have integrity and are not honest," and emphasized his
expectation that recruiters "who sign the agreement will 'hold
up their end of the bargain,' implying clearly that the
Plaintiffs have not."  Id.  Finally, Goodwin boasted about his
company's success in litigation enforcing its agreements and
vowed to protect Goodwin Recruiting.  Plaintiffs say that
Goodwin's message was clear; he "conveyed to the attendees his
view that Plaintiffs had breached their agreement by starting
their own recruiting business," and "wrongfully implied that
Plaintiffs had engaged in illegal activity or a breach of an
agreement."  Id. at ¶ 270.

     Plaintiffs have sufficiently alleged facts from which
falsity can be reasonably inferred.  See Wentworth-Douglass
Hosp. v. Young & Novis Pro. Ass'n, No. 10-CV-120-SM, 2011 WL
446739, at *9 (D.N.H. Feb. 4, 2011) ("it is hardly undisputed
that defendants took [plaintiff's] data without authorization;
that is precisely what is at issue in Counts I and IV of the
. . . complaint.")  Whether they have plausibly stated a
defamation claim is a closer question.  Plaintiffs expressly
allege that Goodwin was conveying "his view" during the June 8

phone call.  Am. Compl. ¶ 270 (emphasis added).  And, a "false statement is not actionable if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts."  Riley v. Harr, 292 F.3d 282, 289 (1st Cir. 2002) (quotations omitted).  But, plaintiffs say, Goodwin's statements imply the existence of a defamatory fact as the basis for his opinion: that plaintiffs had breached their noncompete agreements with defendants, and unethically started their own recruiting business.

     At this juncture, the court cannot conclude, as a matter of law, that Goodwin's statements constitute non-actionable opinion.  Given the context, Goodwin's statements might be construed to imply that plaintiffs unethically breached their contractual agreements with defendants, and that defendants intended to take legal action in response.  See Thomson v. Cash, 119 N.H. 371, 374 (1979) (whether words susceptible of being construed to imply fraud or wrongdoing were used in "the defamatory sense is a question of fact for the jury").  Accordingly, at this early stage, it appears that plaintiffs have passably stated a viable defamation claim, and defendants' motion to dismiss is denied.  A more developed record on summary judgment, or at trial, might, of course, lead to a different outcome.

5.  <u>Unjust Enrichment Claim</u>

Defendants next move for dismissal of plaintiffs' unjust enrichment claim, arguing that the claim is duplicative of their wage and overtime claims, and based on express contracts.  They say that, if plaintiffs were properly classified as independent contractors, then the parties' relationship is governed by the relevant contracts, and, if plaintiffs were improperly classified, then their damages are limited to those permitted under the applicable statutes.

In response, plaintiffs argue that Fed. R. Civ. P. 8(d)(2) permits pleading in the alternative, and that, if the relevant contracts are determined to be void, unjust enrichment would apply.  They further argue that their unjust enrichment claim seeks additional damages that are not compensable under the FLSA or state wage laws: costs and expenses of Goodwin's business that plaintiffs were improperly required to bear, including payroll company costs, and FICA contributions.

Plaintiffs' unjust enrichment claim is premised on defendants' misclassification of them as independent contractors.  However, their unjust enrichment claim is not entirely duplicative because, as plaintiffs point out, they allege defendants failed to provide certain benefits to which plaintiffs say they were entitled.  And, to the extent that defendants are arguing that plaintiffs' claims are preempted,

defendants fail to adequately brief the issue.  At this early
stage, and because Rule 8 of the Federal Rules of Civil
Procedure permits claims pled in the alterative, the court
declines to dismiss plaintiffs' unjust enrichment claim.  See
Silva v. Metro. Life Ins. Co., 762 F.3d 711, 727 (8th Cir. 2014)
(finding that a court is better equipped at summary judgement
"to assess the likelihood for duplicate recovery, analyze the
overlap between claims, and determine whether one claim alone
will provide the plaintiff with adequate relief" (internal
citations omitted).

6.  Declaratory Judgment Claim

Finally, defendants argue that plaintiffs have not
sufficiently stated a claim for declaratory judgment declaring
the contracts between the parties to be void ab initio.
Defendants contend that plaintiffs' declaratory judgment claim
is duplicative, and that plaintiffs' fail to sufficiently allege
facts that might render the agreements void.

Plaintiffs' declaratory judgment claim is problematic for
several reasons.  The claim appears to be ill-founded, and it
suffers from both overbreadth, lack of sufficient factual
pleading, an undeveloped legal theory, and the absence of any
described future injury.  Indeed, the court is inclined not to
exercise its discretion to hear the claim.  But, at this

juncture, it is best to simply leave it to the side and address the more substantive issues that affect the viability of the litigation in this forum.  Accordingly, defendants' motion to dismiss plaintiffs' declaratory judgment claim is denied, without prejudice.

**CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss (document no. 9) is **GRANTED** as to plaintiffs' federal and state claims for misclassification, fraudulent and negligent misrepresentation, and for violation of New Hampshire's Consumer Protection Act.  Defendants' motion is otherwise **DENIED**.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

August 27, 2021

cc:  Counsel of Record